UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>FAITH NEWTON,<br><br>　　　　Defendant | Case No. 21-CR-10035-ADB |

# GOVERNMENT'S TRIAL BRIEF

The United States submits this brief in advance of trial, which is scheduled to commence on June 26, 2023.

## I.　　BACKGROUND

The indictment charges Faith Newton with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count One); health care fraud, in violation of 18 U.S.C. § 1347 (Count Two); conspiracy to pay and receive kickbacks, in violation of 18 U.S.C. § 371 (Count Three); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Seven); and money laundering, in violation of 18 U.S.C. § 1957 (Counts Eight through Fifteen). The charges stem from a scheme devised and executed by Newton to defraud Medicare and MassHealth by using Arbor Homecare Services LLC (Arbor), the home health agency she ran and co-owned with her husband, to submit claims for home health care services that were not medically necessary, not authorized by a treating physician, not provided by a properly trained home health aide, or not provided at all.

1

For the scheme to work, Newton needed a steady flow of MassHealth patients, or "members," for whom Arbor could bill MassHealth. While patients might ordinarily be referred for home health services by a treating physician or hospital, Newton relied on a different approach: illegal kickbacks. These kickbacks included "bonus" payments to patient recruiters as well as cash payments to recruit and retain MassHealth members.

Newton used Arbor's MassHealth patients to submit fraudulent claims to MassHealth for home health aide (HHA) services and skilled nursing visits. Arbor hired patients' family members to be HHAs but did not adequately train those family members—and without that training, the claims submitted for those HHA services were fraudulent. To cover up the lack of required training, Newton falsified training certificates and other documents.

For skilled nursing visits conducted by a licensed practical nurse (LPN) or registered nurse (RN), Newton directed nurses to bill for twice daily visits, seven days a week, regardless of whether the patients needed that many visits and regardless of whether the nurse conducted the visits. In fact, as at least one co-conspirator of Newton's will testify at trial, Arbor fraudulently billed for nursing visits that never happened. At Newton's direction, nurses created false nursing visit notes which were simply copy-and-pasted from templates and prior visits, so that MassHealth could be billed and Arbor could get paid. The evidence at trial will show that patients complained to Arbor staff that their nurses did not show up as scheduled—and Newton told the staff not to log the complaints or write them down.

In four years, from 2013 through January 2017, Arbor made approximately $170,000,000 from MassHealth—a staggering sum. Newton is charged with laundering the proceeds of the fraud scheme, as she and her husband withdrew approximately $50 million from the company

and used it to purchase a Maserati, a $2 million home and other parcels of real estate, and other items and services exceeding $10,000 in value.

## II. EVIDENCE

The government expects to present the following evidence at trial, subject to revision based on ongoing witness preparation and trial planning.

### A. Witnesses

#### 1. CW-1[1]

Newton's co-defendant, CW-1, pleaded guilty to the indictment on September 8, 2022. CW-1, who worked at Arbor from 2014 to 2017, is expected to testify that she was hired and trained by Newton, worked closely with Newton at Arbor, and conspired with Newton to pay kickbacks (including envelopes of cash) to individuals and recruiters to enroll patients for home health care services at Arbor, to bill for patient visits that never occurred, and to bill for medically unnecessary visits.

#### 2. Former Arbor Employees

Former Arbor staff employees Adrianna O'Donoghue, Airanisse Quintana, Amanda Muchioki, Helen Sech, Rosa Gonzalez, Syed Hussain, and Joseph Ouko are expected to testify regarding the conspiracy to pay and receive kickbacks as well as the health care fraud scheme.

For example, these witnesses are expected to testify about the fraudulent nature of Arbor's HHA program. Namely, they will testify that none of the Arbor HHAs completed the 75 hours of federally mandated training, that the HHA certification forms were forged and fraudulent, that many of the HHAs were paid kickbacks in exchange for enrolling family members as patients at Arbor, and that many of the billed HHA patient visits never occurred.

---

[1] The government has anonymized this witness for the purpose of this public filing. The identity of this witness has been disclosed to the defense.

3

These witnesses are also expected to testify about fraudulent billing for skilled nursing visits, as they observed that Arbor billed for nursing visits that were not properly approved by a doctor and for visits that did not take place. These witnesses are also expected to testify about how Newton reacted when concerns about false billing and complaints about missed nursing visits were brought to her attention. For example, Messrs. Hussain and Ouko (the administrator and director of clinical services for Arbor, respectively) were both fired by Newton when they raised concerns about misconduct at Arbor, and other witnesses were instructed to not document patient complaints.

3. Former Arbor Patients

The government expects former Arbor patients—including Ernest Cate, Amber Gardner, John Enwright, and Oscar Ortiz—to testify that they did not need and/or did not receive the home health care visits that were billed to MassHealth under their names; that information about them recorded by Newton in the nursing notes and records was inaccurate; and that they or a family member were paid kickbacks in exchange for enrolling as patients with Arbor.

4. Other Witnesses

Rebecca Njonjo and Cindy Gavin were nurses employed by Nizhoni, a home health company that assumed care of some Arbor patients when Arbor was shut down in 2017. Njonjo and Gavin are expected to testify that the Arbor patients they saw did not need the home health services reflected in their Arbor patient files.

Dr. Anthony Eaton was Arbor's medical director. He is expected to testify that he signed plans of care authorizing home health services for Arbor patients based on information provided to him by Newton and her co-conspirators, and that he trusted and relied on the nurses who prepared the plans of care. Dr. Eaton is expected to further testify that he eventually noticed

discrepancies in Arbor's plans of care, and that he told Newton to stop sending him new patients. He is also expected to testify about a time when Newton offered him a $5,000 check at a meeting, and how he declined the payment because he did not believe things were on the up and up.

Ashleigh Marrier worked for Attis, a company hired by Newton to handle Arbor's billing needs. Marrier is expected to testify that she primarily dealt with Newton on the bills; she relied on the information Newton gave her to create Arbor's billing statements; and that she assumed Newton gave her truthful and accurate information and that Arbor had the required backup. Marrier is also expected to testify about reporting discrepancies to Newton, who failed to respond.

Almas Dossa worked for MassHealth during the relevant time period.[2] Dossa is expected to testify about how the MassHealth home health care program worked, what was required of an entity like Arbor to enroll as a home health provider with MassHealth, the training and certification requirements for HHAs, the levels of home health care, and the material billing requirements for each level of care. Dossa also is expected to testify about Arbor claims data submitted to MassHealth, and the 2015 MassHealth audit of Arbor.

     5.     Law Enforcement Witnesses

HHS-OIG Special Agent Scott Wisnaskas is expected to provide testimony about the investigation of Newton and Arbor and foundational testimony for the admission of various records. SA Wisnaskas is expected to summarize and read in portions of relevant records, including portions of patient records and Arbor personnel files.

---

[2] In its witness list served on March 31, 2023, the government identified a different MassHealth witness, April Miranda. The government has since determined that Ms. Dossa is a more appropriate MassHealth representative, and will update its witness list accordingly.

U.S. Customs and Border Patrol Officer Adam Belmarsh is expected to testify about the extraction of data from Newton's cellular phone during a border inspection in July 2017.[3]

IRS Special Agent Alina Cleverly is expected to testify regarding her review of financial records and MassHealth claims data showing the flow of funds received from MassHealth as reimbursement for fraudulent claims into Arbor bank accounts controlled by Newton, the subsequent movement of that money to Newton's personal accounts, and the use of those funds for the purchase of a luxury car, real estate, and other goods and services. In this role, SA Cleverly will summarize voluminous bank and other financial records.

6. Money Laundering Witnesses

Robert Wyman, Stephen Doherty, Matthew Duffy, Deb Nguyen, and George Holler are expected to testify that they each received a check or wire deposit in excess of $10,000 from Newton's accounts.

7. Records Custodians

As described below, the government will seek to introduce into evidence various medical, claims, insurance, and financial records to prove that Newton committed the charged crimes. These records are admissible under Federal Rule of Evidence 803(6) as records of a regularly conducted activity and are self-authenticating under FRE 902. While the government does not believe more is required to establish the admissibility of the offered records, the government will be prepared to introduce testimony from records custodians if required.

---

[3] In its witness list served on March 31, 2023, the government identified a different CBP agent, Eric McDonald, who coordinated the border inspection of Newton. The government has determined that Officer Belmarsh was directly involved in the inspection and extraction of data from Newton's cellular phone, as reflected in the reports previously produced to the defense concerning the inspection. The government will update its witness list accordingly.

B. **Exhibits**

The government previously filed its exhibit list and will continue to revise and refine that list as it prepares for trial. The following are the main categories of evidence that the government intends to introduce at trial.

1. Patient Medical Records, Billing Records, Claims Data

In addition to the witness testimony described above, the government will seek to introduce medical records for Arbor patients and MassHealth claims data to prove the health care fraud scheme. More particularly, the witnesses will testify that information in the patients' medical records was false, that Newton provided false information about the home health services Arbor patients received to the billing company, that the billing company unknowingly included that false information when it submitted claims for payment to MassHealth on Arbor's behalf, and that MassHealth unknowingly reimbursed Newton for false claims.

2. Home Health Aide Documentation

The government will seek to introduce documents to show that Newton falsified HHA certification records and other records concerning training provided to Arbor home health aides.

3. Text Messages

The government will seek to introduce text messages taken from Newton's phone to prove Newton's knowledge and intent to commit the charged crimes. These messages include, for example:

- A message, dated December 31, 2013, between patient recruiter Adrianna O'Donoghue and Newton about O'Donoghue's referral "bonus": "Hi dear Faith is me Adriana O'Donoghue when is a good time to see you tomorr to talk about business. I have more referrals. However, I like to sign a contract for the bonus." (Ex. 654.)

- A message, dated June 17, 2014, between Mbaria Njorogeh and Newton about a patient referral: "We know what we want so we will do anything." Newton added: "Also I will give you some bonus. That's how it works." (Ex. 669.)

- A message, dated September 12, 2016, between Arbor nurse Joan Kagendo and Newton about an HHA who was paid for visits while their patient was on vacation: "That is bad. That is what they are nailing people on." (Ex. 663.)

4. Bank Records and Canceled Checks

The government will seek to introduce various bank records, which are relevant to prove the money laundering charges, the loss caused by Newton's scheme to defraud, and the payment of kickbacks to induce and increase patient enrollment with Arbor.

## III. CHARGES

### A. Conspiracy to Commit Health Care Fraud, 18 U.S.C. § 1349 (Count One)

The elements of a health care fraud conspiracy are:

(i) an agreement existed between at least two people to commit health care fraud; and

(ii) the defendant willfully joined in that agreement with intent to commit health care fraud.

### B. Health Care Fraud, 18 U.S.C. § 1347 (Count Two)

The elements of health care fraud are:

(i) the existence of a scheme or artifice:

(a) to defraud a health care benefit program; or

(b) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, a health care benefit program;

(ii) the defendant knowingly and willfully participated in the scheme with intent to defraud; and

(iii) the scheme was in connection with the delivery of or payment for health care benefits, items, or services.

C. **Conspiracy to Pay and Receive Kickbacks, 18 U.S.C. § 371 (Count Three)**

The elements of a conspiracy to pay and receive kickbacks in violation of the Anti-Kickback Statute are:

(i) an agreement existed between at least two people to pay and receive kickbacks;

(ii) the defendant willfully joined in that agreement; and

(iii) one member of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

The elements of a violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), are:

(i) the defendant knowingly and willfully offered or paid, or caused to be offered or paid, remuneration (including any kickback, bribe or rebate):

(ii) that one purpose of the remuneration offered, paid, or caused to be offered or paid was to (a) refer individuals to Arbor for the furnishing of home health services, or (b) cause individuals to order or arrange for home health services from Arbor; and

(iii) that Arbor home health services were paid for in whole or in part by a federal health care program.

D. **Money Laundering Conspiracy, 18 U.S.C. § 1956(h) (Count Seven)**

The elements of a conspiracy to commit money laundering are:

(i) an agreement existed between at least two people to commit money laundering; and

(ii) the defendant willfully joined in that agreement with intent to commit money laundering.

E. **Money Laundering, 18 U.S.C. § 1957 (Counts Eight through Fifteen)**

The elements of money laundering are:

(i) the defendant engaged in a monetary transaction over $10,000 by, through, or to a financial institution affecting interstate commerce on or about the date specified in the indictment;

(ii) the defendant knew that the money was derived from criminal activity;

    (iii)    the money was in fact criminally derived from conspiracy to commit health care fraud, health care fraud, or conspiracy to pay and receive kickbacks; and

    (iv)    the monetary transaction took place in the United States or was engaged in by a person in the United States.

## IV.    EVIDENTIARY ISSUES

### A.    Pre-admission of business records under FRE 803(6)

As noted above, the government intends to prove the charged crimes with evidence that includes various medical, claims, insurance, and financial records, which are admissible under the hearsay exception for records of regularly conducted activity, *see* FRE 803(6). The government has obtained (or shortly will obtain) certifications pursuant to FRE 902 for these business records. The government has asked if the defense will stipulate to the authenticity and/or admissibility of these records, but the defense has indicated that it will not stipulate to ***any*** exhibits on the government's exhibit list. These records include those produced by the defendant's own company, Arbor. (The government has subpoenaed Arbor's custodian of records and has asked counsel for Arbor for certification of the produced Arbor records as records of regularly conducted activity, but such certification has not yet been provided.) Because these records are self-authenticating under FRE 902, the government intends to seek their admission into evidence prior to the start of trial.

### B.    Summaries of Voluminous Records

In addition to seeking pre-admission of business records, the government will seek to admit charts and summaries of these records into evidence pursuant to FRE 1006. Rule 1006 permits the use of "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." The records at issue here are voluminous (upwards of 40,000 pages), cannot be conveniently examined in court, are

independently admissible, and were previously produced to the defendant. Accordingly, the government should be permitted under FRE 1006 to admit charts and summary exhibits at trial to provide the jury with easier access to the relevant information.

### C. Lay Opinion Testimony

As described above, the government intends to call several witnesses who previously worked for Arbor in clinical and administrative roles. In addition to providing fact testimony regarding their work experiences, patient observations, and interactions with Newton, the government expects these witnesses will give lay opinion testimony related to patients' need for home health services and/or Arbor's HHA training program. Such testimony from former Arbor employees, including their understanding of relevant medical terminology (*e.g.*, "skilled nursing" or "home health aide" or "plan of care"), is properly considered lay opinion testimony and is admissible under FRE 701. In *United States v. Galatis*, the First Circuit upheld the admission of testimony from employees of a home health agency that included the witnesses' opinion about whether their patients were "homebound" and in need of "skilled nursing" services, finding that "[t]estimony to a witness's understanding of regulatory language can be included pursuant to FRE 701 if it does not seek to offer a conclusive commentary on the law's meaning and is the product of a reasoning process accessible to the average person." 849 F.3d 455, 461 (1st Cir. 2017).

The government also expects other witnesses with experience working in the home health services industry to opine on their understanding of certain medical and regulatory terms. In each case, the opinion testimony will be grounded in their personal, on-the-job experience and based on the kinds of logical inference available to the average person (*e.g.*, that a canceled check with "kickback" written on the memo line was a kickback payment, or that a patient with a

11

full-time janitorial job outside the home was not "homebound" and in need of skilled nursing services).

Similarly, the government expects that MassHealth employee Alma Dossa will give lay opinion testimony about how certain medical terms are used in evaluating home health services claims. Dossa's testimony will not offer conclusive commentary on the legal meaning of those terms, but will merely explain how the terms fit within the larger regulatory scheme and how those terms applied to her work. The lay opinion testimony of all of these witnesses will no doubt be subject to reliability testing through vigorous cross-examination, effectively mitigating any issue with allowing the testimony. *See Galatis*, 849 F.3d at 461 (holding that the properly admitted lay opinion testimony was "susceptible to cross-examination"); *United States v. Ayala-Pizarro*, 407 F.3d 25, 28 (1st Cir. 2005) (same).

### D. Co-Conspirator Statements

The charges in this case include conspiracy to commit health care fraud, conspiracy to commit money laundering, and conspiracy to violate the Anti-Kickback Statute. For the reasons set forth in the motion in limine filed with the Court today, the government seeks to introduce the out-of-court statements of Newton's co-conspirators as substantive evidence at trial pursuant to FRE 801(d)(2)(E).

### E. Conduct Intrinsic to the Fraud Scheme

The government seeks to introduce evidence that Newton withdrew over $50 million from Arbor accounts between 2013 and 2016 and transferred nearly $14 million of those funds from her accounts in the United States to accounts in Kenya. Such evidence not only shows the scope and breadth of the fraud, but also is relevant to prove Newton's knowledge and intent. In particular, evidence that Newton, through Arbor, amassed such a large amount of money ($170

million) in such a relatively short amount of time (about four years), combined with evidence that the HHA program was a sham, that patients were paid to enroll with Arbor, and that patients did not need and were not even getting home health services, supports the inference that Newton knew that Arbor's business model was fraudulent; and evidence that Newton siphoned off $50 million from Arbor and transferred a significant portion of that money out of the country supports the inference that Newton knew the money was proceeds of her fraud.

Similarly, evidence that Newton opened another home health agency, Golden Living, after MassHealth suspended payments to Arbor in 2017, recruited staff and patients from Arbor, and continued to bill MassHealth for visits that were not provided and/or not medically necessaryis highly relevant to and probative of her intent to commit and to continue committing fraud.

Alternatively, the evidence is admissible under Rule 404(b) because it proves Newton's motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Notably, that Newton devised and executed a brazen scheme to defraud MassHealth—through Arbor and then Golden Living—to enrich herself personally, without regard to her patients' medical needs or the law.

### F. Testimony of Lawyers Regarding Non-Privileged Matters

Three witnesses who are expected to testify in connection with charged money laundering counts—Robert Wyman, Deb Nguyen, and George Holler—are practicing attorneys and each was a closing attorney for a real estate transaction referenced in the indictment. The scope of their testimony will be limited to laying the necessary foundation to admit non-privileged business records relating to those transactions (in the absence of any stipulation by the defense), these witnesses' receipt of payment from Newton for services rendered, and other non-

privileged facts concerning the execution of these transactions. The government does not need or intend to elicit any information protected by the attorney-client privilege.

## V. STIPULATIONS

As noted above, Newton's counsel has stated that they will not stipulate to any facts and will not stipulate to the admissibility of any exhibits (including business records admissible under FRE 803(6) and 902). Absent stipulations, the government will be prepared to call all necessary records custodians and fact witnesses to lay the foundation for the admissibility of evidence required to prove the charged offenses.

## VI. DEFENSE EXHIBITS

The defense has not produced an exhibit list to the government and has indicated to the government that it does not have exhibits to produce. The government has also requested reciprocal discovery and reverse *Jencks* material for the individuals on the defense witness list, pursuant to Fed. R. Crim. P. 26.2, but the defense has indicated that it does not have any such material to produce.

## VII. OTHER

### A. Nullification Arguments

As set forth in the motion in limine filed today, the government will object to questions or arguments from the defendant that call for jury nullification. As an example, the government will object to questions or arguments aimed at persuading the jury that Newton should not be found guilty of the crimes charged in the indictment because fraud and kickbacks are widespread in the home health care industry. The government also will object to questions or arguments aimed at jury bias against government health insurance programs and in particular, the propriety or fairness of insurance coverage criteria for home health care services.

### B. Case agent(s) at Counsel Table

With the Court's permission, the government asks that case agents Scott Wisnaskas (HHS-OIG) be permitted to sit at counsel table during the trial.

The government also asks that SA Cleverly, as a summary witness, be permitted to sit in the courtroom during the testimony of other witnesses.

### C. Electronic Presentation of Evidence

With the Court's permission, the government intends to present its audio-visual and documentary evidence in electronic format using the Trial Director software. The government anticipates that a paralegal with the U.S. Attorney's Office will operate Trial Director.

### D. Use of PowerPoint Presentation

With the Court's permission, the government intends to use PowerPoint presentations during its opening statements and closing argument, which will allow for a more organized presentation of the anticipated evidence and summation of the evidence in this case.

## VII. CONCLUSION

Although the foregoing does not exhaust all issues that may arise at trial, it is submitted to assist the Court and to present the government's position on the above matters.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

Dated: June 5, 2023

*/s/ Chris Looney*
William B. Brady
Christopher R. Looney
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

      Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                                       */s/ Chris Looney*
                                                       Christopher Looney
                                                       Assistant United States Attorney

Dated: June 5, 2023